# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Nadhir v. Salomon*, 2011 IL App (1st) 110851

---

| | |
|---|---|
| Appellate Court Caption | ANDREW NADHIR, FRANK BATTAGLIA, and JASON WELCH, Plaintiffs-Appellants, v. BILHA SALOMON, a/k/a Bilha Salomon Messer, and STEVEN T. SIMS, individually and as Trustee of the Steven T. Sims Grantor Trust, Defendants-Appellees. |
| District & No. | First District, Second Division<br>Docket No. 1-11-0851 |
| Filed | September 20, 2011 |
| Rehearing denied | October 20, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court erred in entering judgment for defendant landlords in an action alleging that defendants failed to return plaintiffs' security deposit at the end of their lease in violation of a city's residential landlord and tenant ordinance, since defendants did not give plaintiffs proper notice of the deductions from their deposit and did not return the balance within 21 days as required by the ordinance, and, furthermore, defendants raised their claim that plaintiffs violated the lease provision requiring them to pay the heat bill as an affirmative defense rather than as a counterclaim; therefore, the cause was remanded for the entry of judgment for plaintiffs and a determination of damages and attorney fees under the ordinance. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-M1-178551; the Hon. Roger Fein, Judge, presiding. |
| Judgment | Reversed; cause remanded with directions. |

Counsel on Appeal

Mark Silverman, of Mark Silverman Law Office, Ltd., of Chicago, for appellants.

Brendan R. Appel, of Law Offices of Brendan R. Appel, of Chicago, for appellees.

Panel

JUSTICE CONNORS delivered the judgment of the court, with opinion.
Presiding Justice Quinn and Justice Harris concurred in the judgment and opinion.


**OPINION**

¶ 1        Plaintiffs Andrew Nadhir, Frank Battaglia, and Jason Welch filed suit against defendants Bilha Salomon and Steven T. Sims, alleging that defendants failed to return plaintiffs' security deposit at the conclusion of plaintiffs' lease in violation of the City of Evanston Residential Landlord and Tenant Ordinance (Evanston Municipal Code § 5-3-1 *et seq.* (eff. Feb. 2008)) (ERLTO). Defendants raised an affirmative defense, alleging that plaintiffs had damaged the property, incurred fines by the city, and failed to pay utility bills in violation of both the ERLTO and the lease. Following a bench trial, the trial court found in favor of defendants. We reverse and remand with directions.

¶ 2                                    I. BACKGROUND

¶ 3        In July 2007, plaintiff Nadhir began renting a property in the City of Evanston (City) from defendants pursuant to a written lease agreement. Nadhir rented the apartment located on the first floor of the property for the term of the lease. Plaintiffs Welch and Battaglia later joined Nadhir in living at the property, and all three plaintiffs signed a written lease agreement with defendants for a term to run from July 1, 2009, to July 1, 2010. This lease was for the apartment located on the second floor of the property. Other areas of the building, such as the garage, basement, yard, and patio areas, were considered common areas. Throughout the 2009-10 lease period, the second-floor apartment was the only occupied unit in the building.

¶ 4        Pursuant to section 5-3-5-1 of the ERLTO (Evanston Municipal Code § 5-3-5-1 (eff. Feb. 2008)), plaintiffs paid defendants a security deposit in the amount of $2,625, which represented contributions of $937 from Nadhir and Battaglia, and $750 from Welch. Interest due on the security deposit at the end of the lease period amounted to $38.77.

¶ 5        Plaintiffs vacated the premises at some point prior to the termination of the lease period, but left some items such as couches in the basement area in the care of the new tenants for

later retrieval. On June 30, 2010, plaintiffs and defendant Salomon conducted a walk-through inspection of the premises. The condition of the property at this time was disputed at trial. According to plaintiffs, Salomon noted no issues with the property other than the condition of the lawn. Welch denied that plaintiffs had damaged the property during their stay by, among other things, breaking windows, putting holes in the fence and walls, or setting fire to the yard. Battaglia and Nadhir testified similarly to Welch, and all three asserted that the property was undamaged and clean at the time that they vacated it, and that Salomon had never mentioned any problems during the walk-through.

¶ 6        Plaintiffs each testified that the property had been in poor condition at the time that they had moved in and that it was in about the same condition or better when their lease ended. Nadhir testified that the house continuously needed repairs and that there were constant issues with the plumbing and water. Nadhir stated that they had taken very good care of the premises, and he testified that during the walk-through Salomon had in fact remarked that she was "amazed how good this house looks."

¶ 7        Salomon testified to a markedly different version of events. According to Salomon, when she arrived for the final walk-through she found that the second-floor apartment was "just a disaster, beer cans, there are food, there are shoes, furniture, it was scary." Salomon stated that she often rented to college students, but the condition of the apartment on that date was "one of the worst" that she had seen. Salomon testified that a new group of tenants were due to move into the apartment the next day, and she began making calls in order to have the apartment cleaned. Regarding the condition of the property on that date, Salomon testified:

> "[The] [c]arpet was completely soiled with food, with oily stuff non-recognizable, the ceiling looks like somebody shake beer bottles and stuff just flew up so you can like a stamp of the beer top. Food, broken glass in the patio door leading to the bedroom, carbon monoxide and gas detector yanked out.
>
> *** Kitchen is filth, the refrigerator is broken from the inside, shelves was missing. Some other shelves are being taped with scotch tape.
>
> ***
>
> The yard was completely burned. There was glass all over the place. There was stones, debris, bikes, grills."

A number of pictures were admitted to evidence that Salomon testified represented the state of the property shortly before the final walk-through, but it appears that there were no pictures taken of the premises during the walk-through itself. Salomon also testified that defendants had received a $75 fine from the City of Evanston for accumulated trash in the front yard, which was issued on July 12, 2010. Finally, Salomon testified that she had to give the new tenants a reduction in rent of $677.42 because they were unable to move into the property until July 10, 2010.

¶ 8        The foregoing facts were disputed at trial, but the remaining relevant facts were not. On July 9, 2010, defendants paid $290 to have the premises cleaned. Beginning on July 6, 2010, defendants engaged contractor Jim Karras to perform various repairs on the premises, which included both the first- and second-floor units Among other things, Karras repaired and painted the walls and ceilings, repaired damaged carpet, replaced broken blinds, and replaced

the glass in a broken window. Although Karras repaired the floor in both units, he also testified that he could not tell whether there was "any more or less damage on the first floor than the second floor." Karras issued a bill to defendants on July 15, 2010, which defendants paid on July 18, 2010. Karras later testified that he did not believe that it was possible to repair all of the damage to the property before July 21, 2010. Karras did not finish work on the yard until about two months later.

¶ 9 On July 20, 2010, Salomon sent an e-mail to Nadhir regarding plaintiffs' security deposit. The e-mail listed the amount of the security deposit and then, in a section entitled "Deductions," listed the following:

| | |
|---|---|
| "Fire in lawn have to replace landscaping | TBD |
| Garbage Pick-up | TBD |
| Cleaning after the garbage | TBD |
| City of Evanston fine for garbage in front of property | TBD |
| Broken Window in unit | TBD |
| Smoke & Carbon detectors removed and missing | 150.00 |
| Major scuffing and scratches in hardwood floors | TBD." |

The e-mail also contained a deduction directed solely to Nadhir that read, "Never registered gas meter for heat with Nicor Gas–3200.00."

¶ 10 On July 22, 2010, Nadhir sent an e-mail to defendants requesting the return of plaintiffs' security deposit. Nadhir noted in the e-mail that the deposit was required to be returned no later than July 21, 2010, but that plaintiffs had not yet received it. Sims responded to Nadhir and stated that Salomon was out of town and would not return for several days. On July 31, 2010, defendants sent plaintiffs a second e-mail regarding the security deposit. This e-mail was structurally identical to the first but contained dollar amounts for several line items instead of "TBD." The "Deductions" section now reads:

| | |
|---|---|
| "Fire in lawn have to replace landscaping | 1200.00 |
| Garbage Pick-up | TBD |
| Cleaning after the garbage | 150 |
| City of Evanston fine for garbage in front of property | TBD |
| Broken Window in unit | 150.00 |
| Smoke & Carbon detectors removed and missing | 150.00 |
| Major scuffing and scratches in hardwood floors | 500.00." |

The Nicor deduction as to Nadhir remained the same.

¶ 11 Defendants never returned any portion of the security deposit to plaintiffs. On August 24, 2010, plaintiffs filed a small-claims complaint against defendants, alleging that defendants violated the ERLTO by failing to deliver written notice of the amount of damages or refunding the security deposit within 21 days. At trial, defendants argued that (1) the exact amount of damages to the premises was unknown until after July 21, 2010, because the damage to the premises was so extensive, and (2) the amount of damages was greater than the security deposit and therefore plaintiffs were not entitled to recover any part of their

security deposit. The trial court initially granted defendants' motion for a directed finding at the close of plaintiffs' case-in-chief, but defendants then went on to present their own case-in-chief as an "offer of proof" and the trial court ruled on the merits of the case.

¶ 12    The trial court found that defendants were not required to submit the exact itemized damages within 21 days of the end of the lease, noting that defendants' use of "TBD [to be determined]" was "reasonable under the circumstances" because defendants "actually didn't know what the costs would be until their repairs were actually done and they received the bills, principally from the contractor." The trial court further found that the July 20 e-mail was sufficient to satisfy defendants' obligations under the ERLTO. Finally, the trial court found that while plaintiffs had proven that defendants failed to return the security deposit in the amount of $2,625 plus about $40 in interest, defendants had proven that plaintiffs had caused damage to the property, including the $75 citation, $170 for special garbage pickup, $290 in cleaning costs, $3,562.44 in repairs by Karras, and $1,738 for the Nicor heat bill. The trial court stated that the amount of damages to the property was "more than enough offset for the amount of the security deposit" and accordingly entered judgment in favor of defendants. Plaintiffs timely appealed.

¶ 13                                II. ANALYSIS
¶ 14                              A. "Mootness"
¶ 15    We must initially address defendants' mislabeled argument that plaintiffs' appeal is "moot" on the ground that the trial court granted defendants' motion for a directed finding at the close of plaintiffs' case. Defendants' motion was based on the fact that plaintiffs did not enter a written lease into evidence. The trial court granted the motion, finding that because plaintiffs had testified that they paid a security deposit pursuant to a written lease, they were required to enter the lease into evidence in order to succeed in their claim under the ERLTO. After granting the motion, however, plaintiffs asked the court to allow defendants to present their case as an "offer of proof." The ostensible reason for this was to enable the court to rule on the merits of the case in the event that the trial court's decision was somehow later reversed. Yet after hearing defendants' evidence, the trial court issued a ruling on the merits. Now on appeal, defendants argue that the trial court's directed finding ruling is the controlling one, rather than the ruling on the merits. Defendants argue that because plaintiffs failed to argue in their opening brief that the trial court's directed finding ruling was error, they have forfeited that issue and we need not reach the merits of plaintiffs' appeal.

¶ 16    Regardless of what we may think about the correctness of the trial court's reasoning on the motion for a directed finding, that ruling is irrelevant to this appeal. Not only is defendants' own argument forfeit for lack of citation to authority (Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008)), but the record is clear that the trial court vacated the directed finding after defendants presented their case. The trial court stated that the judgment after trial "can supersede [the directed finding] or it can supplement it. *** In effect it's irrelevant at this point because I just made a ruling on the merits." There was consequently no reason for plaintiffs to raise this issue in their brief, and it has no effect on this appeal.

¶ 17                              B. Return of the Security Deposit

¶ 18        Plaintiffs' first argument on appeal is that the trial court's judgment in favor of
defendants was error because defendants' use of "TBD" in place of a dollar amount for the
deductions in the July 20 e-mail does not satisfy the ERLTO. As noted above, the trial court
found that "TBD" satisfied the ERLTO because it was reasonable under the circumstances.

¶ 19        The meaning of an ordinance is an issue of statutory construction that we review *de novo*.
See *City of Chicago v. Driscoll*, 373 Ill. App. 3d 945, 946 (2007). "When construing the
meaning of a disputed statute, this court's primary objective is to ascertain and give effect
to the intent of the legislature. [Citation.] Legislative intent is best determined by examining
the statutory language, which must be given its plain and ordinary meaning." *Lucas v. Lakin*,
175 Ill. 2d 166, 171 (1997). Moreover, the ERLTO states that it is to be "liberally construed
and applied to promote its purposes and policies" (Evanston Municipal Code § 5-3-1(C) (eff.
Feb. 2008)), which are declared to be "to establish rights and obligations of the landlord and
the tenant in the rental of dwelling units and to encourage the landlord and the tenant to
maintain and improve the quality of the housing" (Evanston Municipal Code § 5-3-1(B) (eff.
Feb. 2008)).

¶ 20        Regarding the return of security deposits, the ERLTO states as follows:

> "Upon termination of the tenancy, property or money held by the landlord as
> security or prepaid rent may be applied to the payment of accrued rent and the
> amount of damages which the landlord has suffered by reason of the tenant's
> noncompliance with section 5-3-4-1 of this chapter, *all as itemized by the landlord
> in a written notice delivered to the tenant together with the amount due* twenty one
> (21) days after tenant has vacated his unit. Any security or prepaid rent not so
> applied, and any interest on such security due to tenant, shall be paid to the tenant
> within twenty one (21) days after tenant has vacated his unit." (Emphasis added.)
> Evanston Municipal Code § 5-3-5-1(C) (eff. Feb. 2008).

The italicized language above is the portion of this section at issue. Defendants concede that
they are required to provide plaintiffs with an itemized list of the *type* of damages within 21
days, but they argue that they are not obligated to provide plaintiffs with the actual cost of
the damages and the specific amount to be deducted from the security deposit at that time.
Defendants argue that the July 20 e-mail, which listed all items except the smoke detector
and the Nicor heat bill as "TBD," was sufficient to satisfy their obligation under the ERLTO.

¶ 21        Defendants' position is not supported by the plain language of the ERLTO. In the event
that a tenant damages the premises, the ERLTO requires the landlord to send the tenant in
writing an itemized list of the damages "*together with* the amount due." (Emphasis added.)
Evanston Municipal Code § 5-3-5-1(C) (eff. Feb. 2008). Although it is at least arguable that
the term "amount due" is slightly unclear when read in isolation, its meaning is obvious
when it is read in context with the next sentence, which requires the return within the same
21-day period of "[a]ny security or prepaid rent *not* so applied." (Emphasis added.) Evanston
Municipal Code § 5-3-5-1(C) (eff. Feb. 2008). It is well settled that when interpreting a
statute, "[t]he statute should be read as a whole and construed 'so that no term is rendered

-6-

superfluous or meaningless.' " *JPMorgan Chase Bank, N.A. v. Earth Foods, Inc.*, 238 Ill. 2d 455, 461 (2010) (quoting *In re Marriage of Kates*, 198 Ill. 2d 156, 163 (2001)). If we were to adopt defendants' position that they may list the dollar amount of any deduction merely as "to be determined" in the 21-day notice, the second sentence of section 5-3-5-1(C) would be completely superfluous because if the amount that must be returned to the tenant is unknown, then it is impossible to return that amount within the 21-day period. Adopting defendants' position would mean that a landlord could evade the 21-day return requirement merely by giving a tenant notice of some unspecified damages, rendering that deadline meaningless. We cannot accept an interpretation of the ERLTO that would lead to such a result.

¶ 22     Contrary to defendants' position, we read the plain language of the ERLTO to require a landlord, within 21 days of a tenant vacating the premises, to send written notice to a tenant of any deductions that the landlord plans to withhold from the security deposit in the form of an itemized list with specific dollar amounts. Within that same 21-day period, the landlord must also deliver to the tenant the balance of the security deposit, minus the itemized deductions.

¶ 23     To the extent that the trial court found and defendants now argue on appeal that a landlord is not required to list a dollar amount for each item of damages if it is reasonable under the circumstances not to, we can find no support for this proposition in the ERLTO. Section 5-3-5-1(C) mandates that a landlord "shall" provide the notice to the tenant and "shall" return the security deposit within 21 days of the end of the lease. There is no "reasonableness" exception to this requirement in the express provisions of the ERLTO, and when construing a statute we may not "read into the statute exceptions, limitations, or conditions which the legislature did not express." *Hines v. Department of Public Aid*, 221 Ill. 2d 222, 230 (2006); accord *Lawrence v. Regent Realty Group*, 197 Ill. 2d 1, 10-11 (2001) ("Under our system of government, courts may not rewrite statutes to make them consistent with their own ideas of orderliness and public policy.").

¶ 24     Moreover, to the extent that defendants argue that they should be excused from the 21-day requirement because the extensive damage to the property allegedly made it impossible for them to specifically list the damages within that time, their argument is unpersuasive. First, there was ample evidence at trial that the majority of the work on the premises was either in progress or had been completed and paid for before the 21-day deadline, particularly the cleaning and trash removal, but this was not reflected in Salomon's July 20 e-mail. Defendants fail to explain why this information was not included in the e-mail or why they should be excused from providing information that they in fact had.

¶ 25     Second and more importantly, the inability to obtain a damages estimate within 21 days is irrelevant to a landlord's duty under section 5-3-5-1(C) to return the security deposit. Landlords are not forever barred from holding their tenants accountable for damage to the property if they return a security deposit before deducting damages from it. Section 5-3-6-1(C) explicitly grants a landlord the right to recover the same damages in a lawsuit from a tenant as can be withheld from a security deposit under section 5-3-5-1(C). See Evanston Municipal Code § 5-3-6-1(C) (eff. Feb. 2008). In the event that a landlord is unable to determine the full extent of damages caused by a tenant within 21 days of the end of the

lease, the landlord can still file suit against the tenant in order to recover those damages. There is no reason to read a "reasonableness" exception into section 5-3-5-1(C) when the ERLTO expressly provides a method for ensuring that a tenant is held accountable for damages to leased premises. *Cf. Mallah v. Barkauskas*, 130 Ill. App. 3d 815, 816-17 (1985) (discussing the effect of a landlord's failure to provide a timely estimate of damages under the Illinois Security Deposit Return Act (Ill. Rev. Stat. 1983, ch. 80, ¶ 101 (now 765 ILCS 710/1 (West 2010)), and noting that the proper course of action is to return the security deposit to the tenant and commence an action for damages).

¶ 26    In sum, the trial court erred when it found that defendants were not required to include a dollar estimate of the damages when they notified plaintiffs that they intended to withhold part of the security deposit. Defendants' use of "TBD" as a placeholder was insufficient to satisfy the ERLTO.

¶ 27    The remaining question is whether defendants were entitled to withhold plaintiffs' entire security deposit. This is a question of fact, and on issues of fact we "defer to the findings of the trial court unless they are against the manifest weight of the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). "A decision is against the manifest weight of the evidence only when the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Id.* at 252.

¶ 28    Under section 5-3-5-1(C), defendants are authorized to withhold only damages "suffered by reason of the tenant's noncompliance with section 5-3-4-1" of the ERLTO. Evanston Municipal Code § 5-3-5-1(C) (eff. Feb. 2008). Section 5-3-4-1 deals with the obligation of a tenant to maintain the leased dwelling. Under this section, a tenant must:

"(A) Comply with all obligations imposed upon tenants by provisions of the codes applicable to the dwelling unit;

(B) Keep that part of the premises that he occupies and uses as safe as the condition of the premises permits;

(C) Dispose from his dwelling unit all ashes, rubbish, garbage and other waste in a clean and safe manner;

(D) Keep all plumbing fixtures in the dwelling unit or used by the tenant as clean as their condition permits;

(E) Use in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air conditioning and other facilities and appliances, including elevators, in the premises;

(F) Not deliberately or negligently destroy, deface, damage, impair or remove and part of the premises or knowingly permit any person to do so;

(G) Conduct himself and require other persons on the premises with his consent to conduct themselves in a manner that will not disturb his neighbor's peaceful enjoyment of the premises; and

(H) Not engage in or permit the unlawful selling, possession, serving, storage, deliverance, manufacture, cultivation, giving away or use of any controlled substance; prostitution; or gambling on the leased premises." Evanston Municipal

Code § 5-3-4-1 (eff. Feb. 2008).

¶ 29 Two factual findings are pertinent to our analysis on this issue. First, the trial court found that plaintiffs vacated the premises on June 30, 2010, which began the 21-day notification and return period for the security deposit. Although defendants argue that plaintiffs left some items behind on the property and therefore did not vacate the premises until July 10, 2010, it does not appear from the record that the trial court made that particular factual finding. In its ruling, the trial court mentioned the July 10 issue but stated that "I don't think I have to necessarily rule on that issue." The trial court's discussion on this point is framed as a hypothetical, not a ruling. Moreover, the trial court had already found that plaintiffs vacated the premises on June 30, so a ruling that they did not vacate until July 10 would be in direct conflict with the court's previous finding of fact. Defendants do not argue that the trial court's finding that plaintiffs vacated the premises on June 30 is against the manifest weight of the evidence, so we accordingly use that date in our analysis.

¶ 30 The second finding of fact is that defendants properly withheld $5,835 as damages, which included $1,738 for the Nicor heat bill, $290 for the cleanup, $170 for garbage removal, the $75 fine, and several Karras bills that totaled $3,562. The trial court treated these damages as an offset to the $2,665 in security deposit and interest that plaintiffs claimed. Because defendants' damages were greater than the total security deposit, the trial court found that plaintiffs were not entitled to the return of any of their security deposit and that defendants were therefore not liable under ERLTO for failing to return it.

¶ 31 Although these damages were all proven at trial, the problem with the trial court's finding on this point is that the July 20 e-mail did not list these damages.[1] The only damages listed in the July 20 e-mail were $150 for the missing smoke and carbon monoxide detectors and $3,200 for the Nicor heat bill. Because section 5-3-5-1(C) only authorizes the landlord to deduct damages from the security deposit that are listed in the 21-day notice, defendants had no authority to deduct any expenses that were not itemized in the July 20 e-mail. The trial court was incorrect to find that defendants were entitled to deduct the Karras bills and other expenses from the security deposit. The evidence is undisputed that these damages were not properly itemized in the July 20 e-mail, so the trial court's finding on that point is against the manifest weight of the evidence.

¶ 32 The question now becomes whether the damages that were itemized were properly deducted from the security deposit. Plaintiffs concede that the $150 for the smoke and carbon monoxide detectors was itemized and was therefore properly withheld. We agree. Section 5-3-4-1(F) prohibits tenants from removing parts of the premises, and there was no dispute at trial that the detectors were missing when plaintiffs moved out.[2]

---

[1]To the extent that defendants argue that the July 31 e-mail lists more itemized damages than the July 20 e-mail, we note that the July 31 e-mail is not relevant to our analysis under section 5-3-5-1(C) because it was not sent until more than 21 days had elapsed since plaintiffs vacated the premises on June 30.

[2]Given that plaintiffs concede that the $150 for the detectors was properly withheld, we assume without deciding that the detectors are parts of the premises within the meaning of section

¶ 33    The Nicor heat bill, however, should not have been withheld. This charge arose from Nidhur's alleged failure to have the utility company transfer the heat bill from defendants to him, which was allegedly required pursuant to the written lease that Nidhur signed in 2007 when he first moved in. Although the July 20 e-mail originally sought $3,200 for this bill, defendant Sims apparently realized at trial that the bill included charges from a time period during which none of plaintiffs had lived in the premises, which is why the trial court found damages of only $1,738 on this item. However, the problem is that regardless of whether Nidhur in fact breached his obligation under the lease, this charge cannot be deducted from the security deposit under section 5-3-5-1(C). Although the trial court found that Nidhur had breached his duty to pay this bill under the lease, compliance with the lease agreement is not an obligation of a tenant under section 5-3-4-1. Defendants were therefore not authorized to deduct anything from the security deposit due to the Nicor heat bill. The trial court's finding to the contrary was against the manifest weight of the evidence.

¶ 34    In sum, the only amount properly deducted from the security deposit was the $150 for the missing detectors. Defendants should have returned all but $150 of the deposit to plaintiffs no later than 21 days after plaintiffs vacated the premises on June 30. Because they did not do so, they are liable to plaintiffs under section 5-3-5-1(F) for twice the amount wrongfully withheld plus reasonable attorney fees.

¶ 35                                    C. Setoff

¶ 36    The last issue concerns whether the trial court properly found that the Nicor heat bill and the Karras work charges fully offset the security deposit. Plaintiffs contend that these damages were improperly assessed, while defendants assert that the trial court correctly assessed these damages and, because the damages were greater than the security deposit, correctly found defendants not liable. Both the trial court and defendants characterized these damages as a "setoff" for the security deposit, and defendants argue that these damages absolve defendant of liability to plaintiffs.

¶ 37    We need not even consider whether the damages evidence that was adduced at trial on the Nicor bill and the Karras work was sufficient. Defendants are not entitled to a setoff of any kind because they failed to counterclaim against plaintiffs. What defendants and the trial court overlooked at trial is that a setoff is a counterclaim, which is a very different procedural device than an affirmative defense:

> "[T]he difference between a counterclaim and an affirmative defense is that a counterclaim seeks affirmative relief whereas an affirmative defense merely attempts to defeat a plaintiff's cause of action. [Citation.] Presently, the procedural concept of setoff is subsumed under the term 'counterclaim' even where no affirmative relief is sought. [Citations.] Setoff most commonly appears as a counterclaim filed by a defendant, based upon a transaction extrinsic to that which is the basis of the plaintiff's cause of action. [Citations.]" *Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc.*, 275 Ill. App. 3d 452, 461-62 (1995).

---

5-3-4-1(F).

-10-

Put another way, an affirmative defense is designed to defeat a defendant's *liability* to a plaintiff, whereas a setoff is a type of counterclaim that is designed to mitigate the *damages* that a liable defendant owes to a plaintiff. Counterclaims are controlled by section 2-608 of the Code of Civil Procedure (735 ILCS 5/2-608 (West 2010)), whereas affirmative defenses are controlled by section 2-613 (735 ILCS 5/2-613 (West 2008)). In small-claims cases such as this one, which are designed to be less formal than other proceedings, issues such as counterclaims and affirmative defenses that normally must be raised in the answer to the complaint need not be specifically pled in written pleadings. See Ill. S. Ct. R. 286(a) (eff. Aug. 1, 1992).

¶ 38    In this case, defendants raised and argued the Nicor heat bill and the Karras charges as an affirmative defense, not as a counterclaim. In fact, the trial court and defense counsel discussed this specific procedural point at the beginning of the trial. During opening statements, defense counsel stated that "the testimony is going to indicate that the amount of damages done to this property far exceeded the security deposit," and defense counsel stated that because of this he intended to ask the trial court for "not a liable verdict." Immediately following defendants' opening statement, the trial court asked, "Is there a counterclaim?" Defense counsel responded, "There is no counterclaim." Defendants then went on to prove up during trial the various damages that they allegedly incurred. After trial, the trial court ruled:

> "[T]he landlords, the defendants here, have adequately shown more than enough offset for the amount of the security deposit *** [plaintiffs are] not entitled to the penalty, statute, the ordinance requires [*sic*] of two times the security deposits and because the damages are greater than the amount of the security deposits, they're not entitled to their [*sic*] return of their security deposits.
>
>     Therefore, the plaintiffs' prayer for relief *** [is] denied. Judgment will be entered for defendant on that prayer ***."

Based on all of these statements and findings, the record unequivocally demonstrates that defendants and the trial court treated the damages asserted by defendants as an affirmative defense that was intended to entirely defeat plaintiffs' claim, rather than as a counterclaim that would not defeat liability but would instead offset any damages awarded to plaintiffs in the event that defendants were found to be liable. Compare 735 ILCS 5/2-613(d) (West 2010) (noting that an affirmative defense "seeks to avoid the legal effect of or defeat[s] the cause of action set forth in the complaint"), with 735 ILCS 5/2-608(a) (West 2008) (defining a counterclaim as a claim "in the nature of a setoff, recoupment, cross claim or otherwise").

¶ 39    The effect of defendants' procedural choice not to assert a counterclaim is twofold. First, the damages that defendants proved at trial are not an affirmative defense that can successfully absolve defendants of liability in this case. Had defendants properly provided plaintiffs with the required notice and properly deducted damages under section 5-3-5-1(C) of the ERLTO, they could have raised their compliance with the ERLTO as an affirmative defense to plaintiffs' claim. See 735 ILCS 5/2-613(d) (West 2010). As we found above, however, defendants failed to comply with the ERLTO, so that defense fails. The fact that defendants were later able to prove damages at trial does nothing to shield them from liability

for their failure to timely return the security deposit, which is the basis of plaintiffs' claim.

¶ 40    Second, defendants' failure to assert a counterclaim bars them from using these damages as a setoff. Regardless of whether defendants improperly withheld plaintiffs' security deposit or failed to prove their affirmative defense, section 5-3-6-1(C) of the ERLTO expressly authorizes landlords to recover these types of damages from tenants. Defendants therefore could have raised these damages as a counterclaim against plaintiffs and sought not only a setoff but also affirmative relief for plaintiffs' damage to the property and Nadhir's alleged breach of the lease provision. Yet defendants did not do so, instead choosing to raise only the affirmative defense that they had complied with section 5-3-5-1(C) of the ERLTO. Because they did not raise a counterclaim, defendants are not entitled to any setoff.

¶ 41    We recognize that this is a somewhat strange result, given that the trial court allowed defendants to prove up their damages at trial and relied on those damages in entering judgment for defendants.[3] The trial court was incorrect to do so, however, and this result follows directly from defendants' procedural choices in litigating this case. Defendants expressly chose not to counterclaim against plaintiffs even though they could have, and the success or failure of the affirmative defense that they did raise was dependent on the trial court's erroneous finding that defendants complied with section 5-3-5-1(C) of the ERLTO. Because defendants' affirmative defense failed and they did not assert a counterclaim, defendants are not only liable to plaintiffs but are also not entitled to any setoff of plaintiffs' damages.

¶ 42                                    III. CONCLUSION

¶ 43    Defendants failed to give plaintiffs proper notice of deductions from their security deposit and failed to return the balance of the security deposit within 21 days as required by section 5-3-5-1(C) of the ERLTO. Defendants failed to prove their affirmative defense of compliance with the ERLTO, and they are therefore liable to plaintiffs. Moreover, defendants are not entitled to any setoff of plaintiffs' damages because they did not assert a counterclaim against plaintiffs. It was therefore error for the trial court to enter judgment in favor of defendants. We accordingly reverse and remand with directions to enter judgment for plaintiffs and for the determination of damages and reasonable attorney fees pursuant to section 5-3-5-1(F) of the ERLTO.

¶ 44    Reversed; cause remanded with directions.

---

[3]Given our resolution of this issue, we do not reach the specifics of plaintiffs' claims of error on the Nicor bill and the Karras work.