# Illinois Official Reports

## Appellate Court

---

### *Boyer v. Buol Properties*, 2014 IL App (1st) 132780

---

| | |
|---|---|
| Appellate Court Caption | JESSICA BOYER, Plaintiff-Appellee, v. BUOL PROPERTIES, WERNER BUOL, and HELGA BUOL, Defendants-Appellants. |
| District & No. | First District, Fourth Division<br>Docket No. 1-13-2780 |
| Filed | November 20, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a dispute over the return of plaintiff's security deposit on an apartment she vacated by mutual agreement with the landlords, the trial court's finding that the deduction for repairs that were not due to reasonable wear and tear was reversed and the cause was remanded for a determination of whether the damage was present when plaintiff moved in, whether plaintiff agreed to pay for the return of the security deposit by certified mail, and whether such an agreement is permitted in view of the silence of the Chicago Residential Landlord and Tenant Ordinance on the subject; furthermore, the landlords' contention that plaintiff's cashing of the returned security deposit and the certified mail fee resulted in an accord and satisfaction was rejected by the appellate court based on the absence of any evidence of a mutual intent to compromise the claim, likewise, the appellate court rejected the landlords' contentions that plaintiff failed to mitigate her damages by not raising any dispute about the amount of the returned security deposit check within the compliance period in the absence of any indication defendants would have returned the disputed funds and that plaintiff was equitably estopped from filing suit after the compliance period had expired. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2012-M1-147018; the Hon. Dennis M. McGuire, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed in part and reversed in part. Cause remanded. |
| Counsel on Appeal | Richard M. Craig, of Law Offices of Richard M. Craig, P.C., of Chicago, for appellants. |
| | Mark Silverman, of Mark Silverman Law Office Ltd., of Chicago, for appellee. |
| Panel | JUSTICE TAYLOR delivered the judgment of the court, with opinion. |
| | Presiding Justice Fitzgerald Smith specially concurred, with opinion. |
| | Justice Epstein concurred in part and dissented in part, with opinion. |

**OPINION**

¶ 1    Defendants Buol Properties, LLC (Buol Properties), Helga Buol (Ms. Buol), and her son, Werner Buol (Mr. Buol), appeal from the trial court's judgment against them for violations of the Chicago Residential Landlord and Tenant Ordinance (Chicago Municipal Code § 5-12-010 *et seq.*) (the Ordinance).

¶ 2    Plaintiff Jessica Boyer was a tenant at the subject premises. After she moved out, defendants returned her security deposit to her via certified mail, deducting $220 for various repairs and $3.40 for postage. Plaintiff then filed the instant suit against them, alleging, in relevant part, that (1) defendants failed to provide her with copies of paid receipts for the repair work in a timely fashion, as required by the Ordinance; (2) defendants were not entitled to deduct the cost of repairs from her security deposit, since the damages at issue were reasonable wear and tear; and (3) defendants were not entitled to deduct the cost of postage from her security deposit.

¶ 3    Following a bench trial, the trial court found in plaintiff's favor and awarded her actual damages, statutory damages of twice her security deposit, and attorney fees, for a total of $8,063.40. Defendants now appeal. For the reasons that follow, we affirm in part, reverse in part, and remand.

¶ 4                                    I. BACKGROUND

¶ 5    In plaintiff's amended complaint, she alleged the following. On June 7, 2011, plaintiff and defendants entered into a written rental agreement for the subject premises. Plaintiff paid a security deposit of $1,575 to defendants. On May 27, 2012, pursuant to the parties' mutual agreement, plaintiff vacated the subject premises. Plaintiff alleged that she left the apartment in the same condition as she received it, except for reasonable wear and tear.

¶ 6    On July 5, 2012, defendants mailed plaintiff a check for $1,352.75 labeled "Return of Sec. Deposit." Included alongside the check was a page titled "Return of Security Deposit Balance," which stated that $1.15 in interest was added and that deductions were made in the amount of $220 for repairs and $3.40 for postage. Also included was a page titled

"Proposal," which stated: "Bolek and Lolek Construction Co. shall provide all necessary labor & specified building materials to *** [p]atch, sand, prime and paint the front hallway and archway in the apartment on the first floor." The page lists the "Labor & Material Cost" as $220. On the bottom of the page there is a photocopy of an unnegotiated check, dated July 3, 2012, from Buol Properties to Bolek & Lolek, in the amount of $220. In the memo line of the check is written the address of the subject premises.

¶ 7    Plaintiff alleged several violations of section 5-12-080(d) of the Ordinance, which provides, in relevant part:

> "(d) The landlord shall, within 45 days after the date that the tenant vacates the dwelling unit ***, return to the tenant the security deposit or any balance thereof and the required interest thereon; provided, however, that the landlord, or successor landlord, may deduct from such security deposit or interest due thereon for the following:
>
>> (1) Any unpaid rent which has not been validly withheld or deducted pursuant to state or federal law or local ordinance; and
>>
>> (2) A reasonable amount necessary to repair any damage caused to the premises by the tenant or any person under the tenant's control or on the premises with the tenant's consent, reasonable wear and tear excluded. In case of such damage, the landlord shall deliver or mail to the last known address of the tenant within 30 days an itemized statement of the damages allegedly caused to the premises and the estimated or actual cost for repairing or replacing each item on that statement, attaching copies of the paid receipts for the repair or replacement. If estimated cost is given, the landlord shall furnish the tenant with copies of paid receipts or a certification of actual costs of repairs of damage if the work was performed by the landlord's employees within 30 days from the date the statement showing estimated cost was furnished to the tenant." Chicago Municipal Code § 5-12-080(d) (amended July 28, 2010).

Plaintiff alleged the following violations of the Ordinance. First, she stated that defendants failed to provide her with an itemized statement of damages within 30 days of her vacating the subject premises, and they also failed to provide her with copies of paid receipts or a certification of actual costs for the repairs performed. Second, she stated that defendants failed to return her security deposit within 45 days of her vacating the subject premises. Third, she stated that defendants' deductions were improper, insofar as the damage at issue was reasonable wear and tear.

¶ 8    The case proceeded to a bench trial. Plaintiff was the sole witness on her own behalf. Plaintiff testified that she entered into a rental agreement with Ms. Buol for the subject property from July 1, 2011, to June 30, 2012. She paid a security deposit of $1,575. In May 2012, plaintiff contacted Ms. Buol and requested that she be allowed to terminate her lease early. Ms. Buol agreed to allow her to terminate the lease on May 31, 2012, because Ms. Buol had another tenant lined up for the property.

¶ 9    Plaintiff testified that she moved out on May 27, 2012. After she moved out, she received a phone call from the Buols informing her that there was damage to the apartment, and she requested a walkthrough of the apartment to see what the damage was. The walkthrough occurred a few days later, on May 29, 2012. Mr. Buol and Ms. Buol's husband Peter were present with the plaintiff. At the walkthrough, the Buols pointed out a dent in the entrance

archway and some marks on the left side of the hallway. Plaintiff testified that those problems were already present when she moved into the apartment. Plaintiff's counsel asked her whether she told Mr. Buol that she was taking responsibility for anything in the apartment. Plaintiff answered, "No. *** Werner offered for me to look into if I wanted to fix it myself, and I said I will look into that, and then I could not get ahold of them again." Plaintiff additionally denied telling any of the defendants to send her anything by certified mail.

¶ 10    At some time after the walkthrough, around May 29 or 30, plaintiff testified that she attempted to call Mr. Buol. Ms. Buol answered the phone. According to plaintiff, Ms. Buol had no idea that there was damage to the apartment. "[S]he hung up the phone on me and I was unable to reach any of the Buols again," plaintiff said. Plaintiff also testified that she never did repair any of the damage to the apartment, because she "could not get ahold of anybody."

¶ 11    Plaintiff stated that on June 13, 2012, she sent defendants a letter in which she mentioned that Mr. Buol told her that she could fix the damages herself. She denied receiving a reply letter from defendants that was sent on June 17, 2012. She stated that the first and only letter she received from the defendants was the July 5, 2012, letter that was attached to her complaint. As noted earlier, that letter included a check for $1,352.75. On cross-examination, plaintiff stated that she deposited that check. Additionally, at no time between receiving the letter and July 20, 2012, did she dispute any amounts listed in that letter.

¶ 12    After plaintiff concluded her testimony, plaintiff rested. Defendants then moved for judgment in their favor, arguing that, by cashing the check without disputing the charges imposed by the defendants, plaintiff had accepted those charges under the doctrine of accord and satisfaction. The trial court denied defendants' motion.

¶ 13    Defendants called both Ms. Buol and Mr. Buol as witnesses. Ms. Buol testified that the original term of plaintiff's lease was through the end of June 2012. Plaintiff requested permission to leave early, and Ms. Buol found a new tenant for the balance of the lease. The new tenancy was to begin on June 1, 2012, and plaintiff was made aware of this.

¶ 14    Near the end of May 2012, Ms. Buol observed damage to the apartment; in particular, the entrance archway was "pushed in." "I'm not a carpenter," Ms. Buol said, "but the damage was pretty serious." Ms. Buol testified that the damage was "absolutely not" present prior to plaintiff's tenancy, because the apartment was newly built and the entranceway was newly decorated before she moved in. On cross-examination, she stated that she did not have any photographs of what the entranceway looked like before plaintiff's tenancy.

¶ 15    Ms. Buol stated that she was not present at the walkthrough with plaintiff and Mr. Buol, and she did not personally discuss the sending of the security deposit with plaintiff. However, after the walkthrough, Mr. Buol told her to send plaintiff's security deposit to her via certified mail. Accordingly, Ms. Buol did so. Ms. Buol testified that she has been a landlord for 40 years, and she "[v]ery seldom" returns security deposits by certified mail; she only does so when a tenant requests it.

¶ 16    Ms. Buol also stated that she received plaintiff's June 13, 2012, letter which referenced plaintiff's earlier conversation with Mr. Buol about fixing the damages herself. When she received that letter, she arranged for Bolek & Lolek to prepare a proposal for repairing the damage. She then sent plaintiff a two-page letter in reply. A copy of the letter is included in the record as one of defendant's exhibits, along with a receipt from the post office indicating

that the letter was sent by priority mail on June 17, 2012. On the first page of the June 17 letter, Ms. Buol states, "I am enclosing the proposal from our contractor. For insurance purposes, we can only use licensed contractors. As soon as the work is completed, I'll return the balance of your secrity [*sic*] deposit." The second page of the letter is entitled "Proposal" and states that Bolek & Lolek "shall provide all necessary labor & specified building materials to *** [p]atch, sand, prime and paint the front hallway and archway in the apartment on the first floor" for $220. (The text on this page is identical to the text on the second page of defendants' July 5, 2012, letter to plaintiff; however, there is no photocopied check on the page.)

¶ 17　　Ms. Buol testified that she had hired Bolek & Lolek at least 30 times in the past, and on those occasions, her cashed check served as her paid receipt. She explained that her bank provided her with a copy of the cashed check that was signed by Bolek & Lolek. On cross-examination, she stated that she did not send that copy to plaintiff: "I mean, she didn't ask for it."

¶ 18　　Finally, Ms. Buol also testified that when she sent plaintiff her security deposit, plaintiff cashed the check without ever indicating to Ms. Buol that the amount was insufficient.

¶ 19　　Mr. Buol was the second witness for the defendants. He testified that the walkthrough occurred on May 27, 2012, and the parties present were himself, plaintiff, and plaintiff's mother. Mr. Buol's father was in the yard but not in the house. During the walkthrough, Mr. Buol noticed damage to the apartment: the archway had "a metal strip type of drywall" that was pushed in approximately an inch deep, with cracks surrounding the indentation. Mr. Buol pointed out the damage to plaintiff. Plaintiff asked whether she could repair it herself. Mr. Buol told her that she could, but she had to do it before the new tenant moved in. In fact, plaintiff never repaired the damage and never contacted him again after the walkthrough.

¶ 20　　On cross-examination, Mr. Buol stated that he did not have any photographs of the damage. On redirect, he stated that one reason for his lack of photographs was that plaintiff took responsibility for the damage and said that she would make sure that it was fixed.

¶ 21　　Mr. Buol also testified that plaintiff requested that her security deposit be returned by certified mail. Mr. Buol thought that this request was "kind of unusual" and informed the plaintiff that it would be at her expense, since "that's not how we usually get it done." He explained that he was familiar with how his parents typically return security deposits, and they never return them by certified mail unless a tenant requests it. Per plaintiff's instructions, he told Ms. Buol that she needed to send plaintiff's security deposit by certified mail.

¶ 22　　Plaintiff then took the stand a second time as a rebuttal witness on her own behalf. She stated that her mother, not her, was the one who was taking photographs at the walkthrough. She also reiterated that she did not take any responsibility for the damages. She said that she asked if she could do the work, stating, "I knew it would be expensive for them to hire their own person and I would rather just do it myself."

¶ 23　　During closing arguments, counsel for plaintiff argued, among other things, that the damage to plaintiff's apartment was merely reasonable wear and tear:

> "There's no pictures and we had two different walkthroughs. *** And all we have from Bolek & Lolek, which is what the defendants rely on, is something that doesn't say fix dents, fix dings, fix scuffs, fix anything the defendants testified about. It

doesn't say fix anything. It doesn't say there's any problem. It says one thing, patch and prime. Painting is always done in an apartment. That's something you might just do as maintenance to maintain your place, paint it, wear and tear."

¶ 24    At the conclusion of the trial, the court found that the defendants never sent a paid receipt for the damage repairs to plaintiff, notwithstanding the "Proposal" contained in defendants' July 5, 2012, letter to plaintiff. The court also found that deducting the cost of postage from a tenant's security deposit was not authorized under the Ordinance. Finally, the court found that the damage to the apartment (which it referred to as "the painting and patching") was reasonable wear and tear. Accordingly, the court found defendants to be in violation of the Ordinance. The court entered judgment for plaintiff in the amount of $3,373.40, consisting of plaintiff's actual damages (the $223.40 deducted from her security deposit) plus twice the amount of her security deposit. See Chicago Municipal Code § 5-12-080(f)(1) (added July 28, 2010) (if a landlord fails to comply with subsection (d), the tenant is entitled to statutory damages of twice her security deposit). The court subsequently awarded attorney fees to plaintiff (see Chicago Municipal Code § 5-12-180 (added Nov. 6, 1991) (prevailing plaintiff in an action under the Ordinance is entitled to costs and fees)), bringing the total judgment against defendants to $8,063.40. Defendants now appeal.

¶ 25                                    II. ANALYSIS

¶ 26    On appeal, defendants raise seven contentions of error. Their first three contentions of error deal with the individual violations of the Ordinance alleged by the plaintiff. First, defendants argue that the damage to the apartment was not reasonable wear and tear, and, therefore, they were entitled to deduct it from plaintiff's security deposit. Second, they argue that they were entitled to deduct the cost of postage from plaintiff's security deposit where plaintiff specifically asked for it to be sent by certified mail and agreed to pay the cost. Third, they challenge the trial court's finding that the photocopy of the check to Bolek & Lolek, sent by defendants to plaintiff in their letter dated July 5, 2012, did not qualify as a paid receipt.

¶ 27    In defendants' remaining four contentions of error, defendants either contend that plaintiff failed to make a *prima facie* case under the Ordinance or they contend that any noncompliance by the defendants should be excused. First, defendants argue that plaintiff failed to prove that defendants were her landlords, as is required for recovery under the Ordinance. Second, they argue that, when plaintiff deposited the check from defendants without disputing its amount, that action constituted acceptance of that amount under the doctrine of accord and satisfaction. Third, they argue that by failing to raise any inquiry about the amount of the check, plaintiff failed to mitigate her damages. Fourth, they argue that plaintiff should be estopped from recovering under the Ordinance where she cashed the security deposit check and then deliberately "waited in the weeds" until the statutory compliance period had expired before raising any objection to defendants' actions. We consider these contentions in turn.

¶ 28                             A. Reasonable Wear and Tear

¶ 29    We begin by considering defendants' contention that the trial court erred in finding that the damage to the apartment was "reasonable wear and tear" where all three witnesses at trial testified to the contrary. We defer to the trial court's findings of fact unless they are against

the manifest weight of the evidence, meaning that an opposite conclusion is apparent or the finding appears to be unreasonable, arbitrary, or not based on evidence. *Goldberg v. Astor Plaza Condominium Ass'n*, 2012 IL App (1st) 110620, ¶ 60.

¶ 30 As noted above, the Ordinance provides that landlords may deduct the cost of repairs from a tenant's security deposit, except for "reasonable wear and tear." Chicago Municipal Code § 5-12-080(d) (amended July 28, 2010). The Ordinance does not explicitly define "reasonable wear and tear," nor has our research disclosed any case law in Illinois that defines the phrase. However, the municipal court of appeals for the District of Columbia has defined the equivalent phrase "ordinary wear and tear" in the context of a lease requiring the tenant to surrender the premises in the condition they were received except for ordinary wear and tear. *Tirrell v. Osborn*, 55 A.2d 725, 727 (D.C. 1947). The court in that case stated:

> "[Ordinary wear and tear] has been defined as the wear which property undergoes when the tenant does nothing more than to come and [go] and perform the acts usually incident to an ordinary way of life. Stated otherwise ordinary wear and tear is the depreciation which occurs when the tenant does nothing inconsistent with the usual use and omits no acts which it is usual for a tenant to perform." *Id.* (citing *Taylor v. Campbell*, 108 N.Y.S. 399, 401 (N.Y. App. Div. 1908)).

¶ 31 With this definition in mind, we proceed to consider the evidence presented at trial regarding the damage to the apartment. As pointed out by defendants, all three witnesses testified that the entrance archway was dented. Mr. Buol stated that the drywall in the archway was pushed in approximately an inch deep, with cracks surrounding the indentation. Ms. Buol also testified that the entrance archway was "pushed in," and she opined that the damage was "pretty serious." Finally, plaintiff admitted that there was "a dent in the archway when you first enter," as well as marks on the hallway. She stated that she asked to repair the damage herself "[b]ecause I knew it would be expensive for them to hire their own person and I would rather just do it myself."

¶ 32 This witness testimony is further corroborated by the "Proposal" that defendants sent to plaintiff, which stated that contractors were being hired to "[p]atch, sand, prime and paint the front hallway and archway in the apartment on the first floor." During closing arguments, counsel for plaintiff argued that this proposal "doesn't say fix dents, fix dings, fix scuffs, fix anything the defendants testified about. It doesn't say fix anything. It doesn't say there's any problem." We disagree. The proposal clearly stated that the contractors were going to "[p]atch" the front hallway and archway, which indicates that there was some kind of hole or indentation that needed to be filled in.

¶ 33 Thus, it is uncontroverted that there was a dent in the entrance archway of plaintiff's apartment. It is further uncontroverted that this damage was "serious" (to quote Ms. Buol) and would be "expensive" to fix (to quote the plaintiff). In light of this evidence, the trial court's finding that the damage to the apartment was merely "reasonable wear and tear" was against the manifest weight of the evidence. See *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 504 (2007) (a finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident). A serious, expensive-to-fix dent in an archway is more damage than would normally occur when a tenant simply comes and goes and performs the acts usually incident to an ordinary way of life. See *Tirrell*, 55 A.2d at 727; *Taylor*, 108 N.Y.S. at 401.

¶ 34    Plaintiff argues that even if the damages to the apartment did not constitute reasonable wear and tear, she is still not responsible for them, because they were already present when she moved into the apartment. This was a contested issue at trial: although plaintiff testified that the damages to the apartment "were there before [her]," Ms. Buol testified that the damage was "absolutely not" present prior to plaintiff's tenancy. The trial court did not reach the issue of whether the damage was preexisting, since it erroneously found it to be reasonable wear and tear.

¶ 35    We therefore remand for the trial court to determine whether the damage to the apartment was present at the time that plaintiff moved into the apartment. If so, then its judgment with regard to the $220 should be undisturbed. However, if the court finds that the damage occurred during the tenancy, then defendants were entitled to deduct the cost of repairs from plaintiff's security deposit (Chicago Municipal Code § 5-12-080(d) (amended July 28, 2010)), and plaintiff's judgment should be reduced by $220.

¶ 36                            B. Deduction of Postage

¶ 37    Defendants next argue that they were entitled to deduct the cost of postage from plaintiff's security deposit, since plaintiff explicitly asked for the security deposit to be sent by certified mail and agreed to pay the associated costs. Plaintiff argues that the Ordinance does not permit such deductions even at a tenant's request. Plaintiff further argues that, regardless of this court's interpretation of the Ordinance, she expressly denied requesting certified mail, and the trial court was entitled to believe that denial.

¶ 38    Deductions from security deposits are covered in section 5-12-080(d) of the Ordinance, which provides, in relevant part:

> "(d) The landlord shall, within 45 days after the date that the tenant vacates the dwelling unit ***, return to the tenant the security deposit or any balance thereof and the required interest thereon; provided, however, that the landlord, or successor landlord, may deduct from such security deposit or interest due thereon for the following:
>
> > (1) Any unpaid rent which has not been validly withheld or deducted pursuant to state or federal law or local ordinance; and
> >
> > (2) A reasonable amount necessary to repair any damage caused to the premises by the tenant ***." Chicago Municipal Code § 5-12-080(d) (amended July 28, 2010).

In interpreting this language, we are mindful that the fundamental goal of statutory interpretation is to ascertain and give effect to the intent of the legislature. *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 6 (2009). The best indicator of legislative intent is the language of the statute, which must be accorded its plain and ordinary meaning. *Id.*; *People v. Trainor*, 196 Ill. 2d 318, 332 (2001). Municipal ordinances are interpreted using the same rules of statutory interpretation. *In re Application of the County Collector*, 132 Ill. 2d 64, 72 (1989).

¶ 39    Plaintiff argues that, under section 5-12-080(d), the two enumerated deductions listed above are the only deductions that a landlord is allowed to take from a tenant's security deposit. In support, plaintiff cites *Nadhir v. Salomon*, 2011 IL App (1st) 110851. *Nadhir* deals with the Evanston Residential Landlord and Tenant Ordinance (Evanston Municipal Code § 5-3-1 *et seq.* (eff. Feb. 2008)) (ERLTO), which is similar to the Ordinance in that it

authorizes only a handful of security deposit deductions. *Nadhir*, 2011 IL App (1st) 110851, ¶ 28. In *Nadhir*, the subject lease provided that the tenant, Nadhir, would be responsible for the gas bill. *Id.* ¶ 9. When Nadhir vacated the premises without having paid the gas bill, the landlords deducted it from his security deposit. *Id.* ¶¶ 9-10. This court held that even though Nadhir had breached his obligation under the lease, the landlords were not entitled to deduct the cost of his gas bill from his security deposit, because it was not one of the enumerated security deposit deductions authorized under the ERLTO. *Id.* ¶ 33.

¶ 40    Under the plain language of the Ordinance, as well as the reasoning in *Nadhir*, it seems clear that, in the absence of an agreement between the parties, a landlord may not unilaterally deduct postage from a tenant's security deposit. However, in this case, defendants allege that the deduction was not unilateral; rather, plaintiff explicitly requested that her security deposit be returned by certified mail and agreed to pay the cost. The Ordinance is entirely silent as to whether parties may make such agreements. Nor does *Nadhir* purport to speak on this issue.

¶ 41    In this case, the existence of an agreement regarding postage was a disputed issue at trial. Mr. Buol testified that plaintiff asked for her security deposit to be sent by certified mail at her expense. Plaintiff, on the other hand, denied telling defendants to send her anything by certified mail. The trial court never made any findings on this issue, insofar as it simply found that postage was not an enumerated deduction under section 5-12-080(d) of the Ordinance.

¶ 42    Accordingly, we remand for the trial court to make a factual finding as to whether plaintiff actually agreed that her security deposit would be returned by certified mail at her expense. If it finds that no such agreement existed, then its judgment with regard to the $3.40 should remain undisturbed. If, however, it finds that there was such an agreement, then it should decide whether such an agreement between landlord and tenant is permissible under the specific facts of this case.

¶ 43                    C. Whether the Photocopied Check Was a "Paid Receipt"

¶ 44    Defendants next argue that the trial court erred when it found that the photocopied check to Bolek & Lolek included in defendants' July 5, 2012, letter did not constitute a paid receipt under the Ordinance.

¶ 45    Section 5-12-080(d) of the Ordinance provides that, where a landlord deducts money from a tenant's security deposit to pay for repairs,

> "the landlord shall deliver or mail to the last known address of the tenant within 30 days an itemized statement of the damages allegedly caused to the premises and the estimated or actual cost for repairing or replacing each item on that statement, attaching copies of the paid receipts for the repair or replacement. If estimated cost is given, *the landlord shall furnish the tenant with copies of paid receipts \*\*\** within 30 days from the date the statement showing estimated cost was furnished to the tenant." (Emphasis added.) Chicago Municipal Code § 5-12-080(d) (amended July 28, 2010).

In the present case, as has been discussed earlier, defendants mailed plaintiff her security deposit check on July 5, 2012. Included alongside the check was a one-page "Proposal" which stated that Bolek & Lolek would perform the necessary repairs for $220. On the bottom of the page was a photocopy of an unnegotiated check for $220, from the account of Buol Properties, LLC, signed by Ms. Buol and made out to Bolek & Lolek. The check was

dated July 3, 2012, and the memo line of the check contains the address of the subject premises. Plaintiff argues that this photocopied check is insufficient to constitute a paid receipt. We agree.

¶ 46 We note initially that the Ordinance does not define the term "receipt," nor do the parties cite any law as to its meaning. However, Black's Law Dictionary defines a receipt as "[a] written acknowledgment that something has been received." Black's Law Dictionary 1382 (9th ed. 2009); see also Merriam-Webster's New Collegiate Dictionary 714 (7th ed. 1969) (defining a "receipt" as "a writing acknowledging the receiving of goods or money"). Thus, in order to qualify as a receipt, the documentation provided by defendants would have to show that the $220 in question was actually received by Bolek & Lolek. This requirement is not satisfied by a photocopy of a check that has not been negotiated by its payee. As plaintiff points out in her brief, a photocopy of an unnegotiated check can easily be produced without the check being given to anyone, just like a picture of cash.

¶ 47 Accordingly, we affirm the trial court's finding that defendants failed to furnish plaintiff with copies of paid receipts for the work done to her former apartment, in violation of section 5-12-080(d) of the Ordinance.

¶ 48 D. Whether Defendants Were Actually Plaintiff's Landlords

¶ 49 Defendants' next contention is that the trial court should have entered judgment for defendants where plaintiff failed to prove that defendants were her landlords, as is required for recovery under the Ordinance.

¶ 50 The Ordinance defines a "landlord" as "the owner, agent, lessor or sublessor, or the successor in interest of any of them, of a dwelling unit or the building of which it is part." Chicago Municipal Code § 5-12-030(b) (amended Nov. 6, 1991). At the close of trial, the court entered a factual finding that defendants were, in fact, plaintiff's landlords. We review the court's finding under the manifest weight of the evidence standard. *Goldberg*, 2012 IL App (1st) 110620, ¶ 60.

¶ 51 In this case, there are three defendants: Ms. Buol, Mr. Buol (who is not Ms. Buol's husband, but her adult son), and Buol Properties. It is readily apparent from the trial record that Ms. Buol was plaintiff's landlord. During trial, plaintiff's counsel asked her, "And did you enter into a rental agreement for this property that we're talking about at 1829 West Melrose in Chicago with Ms. Buol?" to which plaintiff replied, "Yes." Subsequently, plaintiff explicitly referred to Ms. Buol as her landlord:

> "COUNSEL FOR PLAINTIFF: And there was a discussion with the landlord about moving out early and what would happen?
>
> PLAINTIFF: Yes.
>
> Q. Can you tell us about when that was and with whom it was?
>
> A. It was with Helga Buol."

This testimony was corroborated by the testimony of Ms. Buol, who stated that she had been a landlord for 40 years and that plaintiff was "our tenant." Finally, during closing arguments, counsel for defendants admitted that Ms. Buol was the landlord when he referred to her as "a landlord that takes all of this very, very seriously."

¶ 52 As for Mr. Buol, defendants assert that he was merely an "unfortunate volunteer who manned the walkthrough" and had no further involvement with the plaintiff. This is belied by

plaintiff's exhibits, which show that Mr. Buol was one of the parties who held plaintiff's security deposit and accounted for the deductions therefrom. On the "Proposal" included with plaintiff's security deposit, the "Customer" for the repairs to plaintiff's apartment is listed as "Werner & Helga Buol." Even more significantly, the actual security deposit check is from a bank account jointly owned by Mr. Buol and Ms. Buol.

¶ 53    Finally, Buol Properties was the party that paid for the repairs to plaintiff's apartment that were later deducted from her security deposit. This is shown by the photocopied check to Bolek & Lolek, which is from the account of Buol Properties and signed by Ms. Buol. Based upon this evidence, the trial court could reasonably infer that Buol Properties was acting as the landlord, or, at the very least, was acting as an agent of Ms. Buol in her capacity as landlord. No alternate explanation was offered, at trial or otherwise, for why Buol Properties would be paying for the repairs to plaintiff's apartment. Thus, the trial court's finding that defendants were plaintiff's landlords is not against the manifest weight of the evidence.

¶ 54                                 E. Accord and Satisfaction

¶ 55    We next consider defendants' contention that, when plaintiff deposited defendant's check for $1,352.75, that act constituted the acceptance required for accord and satisfaction.

¶ 56    An accord and satisfaction is a contractual method of discharging a debt or claim by some performance other than that which was originally due. *Saichek v. Lupa*, 204 Ill. 2d 127, 135-36 (2003); *Koules v. Euro-American Arbitrage, Inc.*, 293 Ill. App. 3d 823, 829 (1998). To constitute an accord and satisfaction, there must be (1) a *bona fide* dispute between the parties as to the amount owed between them, (2) an unliquidated sum owed, (3) consideration, (4) a shared mutual intent to compromise the claim at issue, and (5) execution of the agreement. *Saichek*, 204 Ill. 2d at 135. The "accord" is the agreement between the parties, and the "satisfaction" is its execution or performance. *Fremarek v. John Hancock Mutual Life Insurance Co.*, 272 Ill. App. 3d 1067, 1071 (1995). Because an accord and satisfaction is contractual in nature, courts focus on the parties' intent when determining whether an accord and satisfaction has been reached and executed. *Saichek*, 204 Ill. 2d at 135 (citing *Solomon v. American National Bank & Trust Co.*, 243 Ill. App. 3d 132, 134-35 (1993) (parties' intent is of "central importance")). The debtor bears the burden of showing that the creditor intended to accept the payment in full satisfaction of the claim at issue; in the absence of such an accord, the payment only operates as a discharge of the amount paid. *Solomon*, 243 Ill. App. 3d at 135.

¶ 57    In cases where there is a genuine, ongoing dispute over the amount owed under a contract, and one party offers to settle the dispute by tendering a check that purports to be in full satisfaction of the contract, the other party's act of cashing the check can count as the acceptance required for an accord. *Shea, Rogal & Associates, Ltd. v. Leslie Volkswagen, Inc.*, 216 Ill. App. 3d 66, 71 (1991) ("the very act of knowingly accepting and cashing or depositing a check upon which conditional language has been added is the hallmark of an accord and satisfaction"). This court has explained the theory behind this doctrine as follows:

        "[W]here there is a bona fide dispute as to the amount due, it makes no difference that the creditor protests or states that he does not accept the amount proffered in full satisfaction. The creditor must either accept what is offered with the condition upon which it is offered or refuse it. [Citations.] The acceptance of the check given in full satisfaction of a disputed claim is an accord and satisfaction if the creditor took the

check with notice of the condition upon which the check was tendered. [Citations.] A creditor has no right to cash the check and thereby obtain the benefit of such offer without its accompanying burden of compromise." *Quaintance Associates, Inc. v. PLM, Inc.*, 95 Ill. App. 3d 818, 822 (1981).

¶ 58 Plaintiff argues that no accord and satisfaction occurred in this case, because there was no evidence of a mutual intent to compromise the claim. We agree. The parties agree that, at the time the defendants sent plaintiff the check for $1,352.75, plaintiff had not yet raised any objections to that amount. Her objections only came later. Since there was not yet any disagreement as to the amount due, the defendants had no reason to intend to compromise their claim. See *id.* at 821 (an accord "presupposes a disagreement as to the amount due").

¶ 59 A recap of the events in this case is instructive here. The parties agree that plaintiff moved out of her apartment on May 27, 2012. On or around that date, she went on a walkthrough of the apartment with Mr. Buol. Mr. Buol pointed out damage to the apartment, and plaintiff offered to fix it herself. On June 13, 2012, plaintiff sent a letter to the Buols in which she again mentioned the possibility of fixing the damage herself. Ms. Buol testified that she subsequently mailed a reply letter to plaintiff on June 17, 2012, in which she informed plaintiff that, for insurance purposes, they could only use licensed contractors, and she proposed to have Bolek & Lolek perform the repairs for $220. Plaintiff denied ever receiving that letter. In any event, the parties agree that the next correspondence between the parties was on July 5, 2012, when defendants sent plaintiff a check for $1,352.75 labeled "Return of Sec. Deposit." Plaintiff cashed the check, but she never disputed the amount of the check, or the listed deductions, until the filing of the instant lawsuit.

¶ 60 Under either party's version of events, it is apparent that, at the time defendants sent plaintiff the check, they were not aware that she disputed the amount or the deductions listed in the attached letter. Thus, it can hardly be said that the defendants intended the check as a compromise and settlement of a disputed claim. In the absence of such intent, there can be no accord and satisfaction. *Saichek*, 204 Ill. 2d at 135.

¶ 61 Defendants nevertheless argue that the instant case is analogous to *MKL Pre-Press Electronics/MKL Computer Media Supplies, Inc. v. La Crosse Litho Supply, LLC*, 361 Ill. App. 3d 872 (2005), and *Quaintance*, 95 Ill. App. 3d 818, in which the court found that the act of cashing a check constituted agreement to an accord. Both of these cases are readily distinguishable, because in both cases, there was clearly an ongoing dispute between the parties at the time the check at issue was tendered. Indeed, the factual difference between these cases and the instant case helps to illustrate why the doctrine of accord and satisfaction is inapplicable here.

¶ 62 In *MKL*, plaintiff was a distributor for printing systems and related equipment manufactured by defendant. *MKL*, 361 Ill. App. 3d at 874. After defendant cancelled the distribution agreement between the parties, plaintiff sent defendant a bill for repairs and assorted services that it had performed earlier that year. *Id.* at 875. Defendant wrote back, objecting to the charges and stating that defendant would not pay them. Plaintiff's attorney then sent defendant a demand letter for $26,453.31. Defendant responded via letter, stating, " '[W]e are sending you the final payment in the amount of $1,696.47.' " *Id.* at 875-76. Included was a check for that amount, marked " 'FINAL PAYM.' " *Id.* at 876. Under these facts, the *MKL* court found that plaintiff's act of cashing that check served as acceptance of an accord. *Id.* at 878. It specifically found that a shared mutual intent to compromise the

parties' claims could be inferred from their conduct, because, in context, defendant's tender of the check marked " 'FINAL PAYM' " was clearly an attempt to settle an ongoing dispute between the parties. *Id.* The same cannot be said in the instant case, where no such dispute existed until after plaintiff had already deposited the check.

¶ 63    The facts of *Quaintance* are similar to those of *MKL*. The *Quaintance* defendant hired the plaintiff to recruit a qualified person for employment as defendant's controller. *Quaintance*, 95 Ill. App. 3d at 819. After plaintiff's search ended in failure, a disagreement arose as to how much defendant owed plaintiff. *Id.* at 822. Plaintiff sent defendant a letter requesting fees and expenses in the amount of $9,808.61. Defendant sent back a letter stating that it would only pay 60% of the requested fees and further stating: " 'I don't know any other way to handle the situation but I do believe this is fair. I consider this the end of the matter but certainly would be prepared to discuss it if you so desire.' " *Id.* Included with the letter was a check for $6,060.48. Plaintiff accepted and cashed the check. The *Quaintance* court found this to be an accord and satisfaction, stating, "There is no allegation that plaintiff did not understand that the proffered check was offered as a compromise and settlement." *Id.* at 823.

¶ 64    By contrast, in the present case, the proffered check could hardly have been a "compromise and settlement," insofar as the dispute between the parties had not yet arisen and there was nothing yet to compromise or settle. The *Quaintance* court itself implicitly acknowledged this divide when it stated that an accord "presupposes a disagreement as to the amount due." *Id.* at 821. Thus, the trial court did not err in holding that plaintiff's act of cashing the check did not constitute an accord and satisfaction.

¶ 65                                    F. Mitigation of Damages

¶ 66    Defendants next argue that plaintiff's recovery should be reduced because she failed to mitigate her damages by not raising any dispute regarding the amount of her security deposit check within the statutory compliance period. As discussed earlier, defendants mailed plaintiff her security deposit check on July 5, 2013. At that time, the statutory compliance period for returning the security deposit had not yet ended. It would not end until six days later, on July 11, 2013. Chicago Municipal Code § 5-12-080(d) (amended July 28, 2010) (landlord must return tenant's security deposit within 45 days after the tenant vacates the premises). Defendants posit that, within that six-day window, plaintiff could have informed defendants that she believed she was entitled to more money, and, if she had done so, defendants might have chosen to return the disputed funds, thus reducing the damages incurred by plaintiff. Defendants argue that plaintiff's failure to take such action should be construed as a failure to mitigate her damages.

¶ 67    Under the common-law doctrine of mitigation of damages, a plaintiff in a breach of contract suit cannot recover losses that could have been reasonably avoided. Restatement (Second) of Contracts § 350 (1981). It is sometimes said that a plaintiff has a "duty" to mitigate damages, but this is not entirely accurate, because the plaintiff incurs no liability for her failure to act. She simply cannot recover for that portion of losses which she could have avoided. *St. George Chicago, Inc. v. George J. Murges & Associates, Ltd.*, 296 Ill. App. 3d 285, 293 (1998). In other words, where an injured party permits her loss to be unnecessarily enhanced through her own negligence or willfulness, that increased loss will be borne by the injured party. *Id.*; see *Holland v. Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560, ¶ 213 (injured party must exercise reasonable diligence and ordinary care in seeking to

minimize damages). The failure to mitigate damages is an affirmative defense that must be pleaded and proved by the defendant. *Rozny v. Marnul*, 43 Ill. 2d 54, 73 (1969) (rejecting defendant's mitigation of damages argument where defendant's trial counsel made no effort to plead or prove failure to mitigate).

¶ 68 Plaintiff argues that, under the specific statutory scheme set forth in the Ordinance, failure to mitigate damages is not a defense; rather, a tenant is entitled to the full measure of damages regardless of whether those damages were avoidable. However, we need not reach this argument. Even if we assume, for the sake of argument, that failure to mitigate damages is still a valid defense under the Ordinance, defendants' claim still fails, because defendants did not present any evidence at trial to show that the damages at issue were actually avoidable. Defendants' claim is premised upon the argument that, if plaintiff had disputed the amount of her security deposit check within the statutory compliance period, defendants *might* have chosen to return the disputed funds. However, none of the defendants testified at trial that they *would* actually have returned the disputed funds. The trial transcript is completely silent on this matter. Accordingly, defendants' claim in this regard is nothing more than speculation and conjecture. Without evidence that the damages at issue could reasonably have been avoided, defendants' mitigation of damages argument necessarily fails. *Toushin v. Gonsky*, 77 Ill. App. 3d 508, 517 (1979) (trial court did not err in rejecting mitigation of damages where the opportunity to mitigate damages was merely speculative); see *Rozny*, 43 Ill. 2d at 73 (failure to mitigate damages is an affirmative defense that must be pleaded and proved by defendant).

¶ 69                                                   G. Equitable Estoppel

¶ 70 Defendants' final contention is that plaintiff's conduct in cashing the security deposit check and raising no objections to its amount or the attached documentation within the statutory compliance period should equitably estop her from now raising objections before the court. In response, plaintiff argues that the doctrine of equitable estoppel should not apply to cases brought under the Ordinance, because the Ordinance does not explicitly provide that equitable estoppel is a defense. Plaintiff further argues that, in any event, the elements of equitable estoppel are not satisfied under the facts of this case. We begin by considering this latter argument.

¶ 71 The general principle behind equitable estoppel is that, where a person's statements or conduct induce a party to take or forbear from action, that person will not be allowed to deny her words or acts to the detriment of the other party. *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 313 (2001). The elements of equitable estoppel are as follows:

> " 'A party claiming estoppel must demonstrate that: (1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when that party decided to act, or not, upon the representations; (4) the other person intended or reasonably expected that the party claiming estoppel would determine whether to act, or not, based upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof.' " *Orlak v.*

- 14 -

*Loyola University Health System*, 228 Ill. 2d 1, 21-22 (2007) (quoting *DeLuna v. Burciaga*, 223 Ill. 2d 49, 82-83 (2006)).

See also *Vaughn v. Speaker*, 126 Ill. 2d 150, 162-63 (1988). The party claiming estoppel bears the burden of proving these elements by clear and unequivocal evidence. *Geddes*, 196 Ill. 2d at 314.

¶ 72    In this case, defendants claim that plaintiff is estopped from bringing suit by her silence, which lulled the defendants into believing that the security deposit check and the attached "receipt" were both sufficient under the Ordinance. In this vein, our supreme court has stated:

> "Estoppel may arise from silence as well as words. It may arise where there is a duty to speak and the party on whom the duty rests has an opportunity to speak, and, knowing the circumstances, keeps silent. [Citations.] It is the duty of a person having a right, and seeing another about to commit an act infringing upon it, to assert his right. He cannot by his silence induce or encourage the commission of the act and then be heard to complain." (Internal quotation marks omitted.) *Geddes*, 196 Ill. 2d at 314.

However, this kind of estoppel by silence can only occur where one party is aware of the facts and the other party is ignorant. It does not operate where the means of knowledge are equally open to both parties. *Maniez v. Citibank, F.S.B.*, 404 Ill. App. 3d 941, 950 (2010); *Trossman v. Philipsborn*, 373 Ill. App. 3d 1020, 1041-42 (2007). In other words, " ' "[a] party claiming the benefit of an estoppel cannot shut his eyes to obvious facts, or neglect to seek information that is easily accessible, and then charge his ignorance to others." ' " *Id.* at 1042 (quoting *Town & Country Bank of Springfield v. James M. Canfield Contracting Co.*, 55 Ill. App. 3d 91, 95 (1977), quoting *Vail v. Northwestern Mutual Life Insurance Co.*, 192 Ill. 567, 570 (1901)). Furthermore, a party is not estopped by her silence where she is in ignorance of her rights. *JPMorgan Chase Bank, N.A. v. East-West Logistics, L.L.C.*, 2014 IL App (1st) 121111, ¶ 43 (citing *Maniez*, 404 Ill. App. 3d at 950).

¶ 73    With these principles in mind, we turn to consider the facts of the present case. Defendants essentially accuse plaintiff of "waiting in the weeds": according to them, plaintiff consulted with an attorney and cashed the security deposit check within the statutory compliance period, but she deliberately refrained from making her concerns known to the Buols until the compliance period had ended. Plaintiff argues that defendants' version of events is factually incorrect, since plaintiff's initial consultation with an attorney did not occur until after the compliance period had already ended. That is, she did not learn of her rights under the Ordinance until it was too late for the defendants to cure any violation. Plaintiff further argues that the record does not support defendants' assertion that she cashed the check within the statutory compliance period.

¶ 74    We agree with plaintiff on both points. It is undisputed that plaintiff first consulted with an attorney on July 18, 2012. Section 5-12-080(d) states that a landlord must return a tenant's security deposit within 45 days after the date that the tenant vacates the premises. Chicago Municipal Code § 5-12-080(d) (amended July 28, 2010). In this case, plaintiff vacated the premises on May 27, 2012. Forty-five days from that date is July 11, 2012, a full week before plaintiff's first consultation with an attorney. With regard to copies of paid receipts for repair work, section 5-12-080(d)(2) provides that such receipts must be provided "within 30 days from the date the statement showing estimated cost was furnished to the tenant." Chicago Municipal Code § 5-12-080(d)(2) (amended July 28, 2010). In this case, defendants mailed a

statement of estimated cost to the plaintiff on June 17, 2012. Thirty days from that date is July 17, 2012–again, before plaintiff's first meeting with her attorney.[1] There is no indication in the record that plaintiff was aware of her rights before that initial meeting with her attorney. As noted earlier, a party is not estopped by her silence where she is ignorant of her rights. *JPMorgan Chase Bank*, 2014 IL App (1st) 121111, ¶ 43; *Maniez*, 404 Ill. App. 3d at 950. Accordingly, plaintiff's silence during the statutory compliance period does not estop her from bringing the instant suit.

¶ 75    Plaintiff is also correct in pointing out that the record does not disclose the exact date on which she cashed the security deposit check. None of the parties testified at trial regarding when the check was cashed. The check itself bears the notation "Void after Sept 1, 2012," which tells us that it was presumably cashed before that date; but that is all that we know. Thus, the record does not support defendants' claim that plaintiff cashed the check before the end of the compliance period and then waited out the remainder of that period.

¶ 76    Finally, even if plaintiff had been aware of her rights within the statutory compliance period, her silence would not give rise to equitable estoppel where the means of knowledge were equally open to both parties. *Maniez v. Citibank, F.S.B.*, 404 Ill. App. 3d 941, 950 (2010); *Trossman v. Philipsborn*, 373 Ill. App. 3d 1020, 1041-42 (2007). In this regard, we are guided by *Trossman*, in which this court rejected an equitable estoppel claim under similar circumstances. In *Trossman*, the counterplaintiffs and counterdefendant Trossman were guarantors of a certain loan (the Wysteria loan). *Id.* at 1023. The parties agreed that Trossman would pay a *pro rata* share of the payments on the Wysteria loan; that is, whenever counterplaintiffs made a payment, Trossman had to match a certain percentage of that payment. *Id.* Trossman failed to make payments under the agreement, and counterplaintiffs sued. *Id.* at 1022. In his defense, Trossman argued that his payment obligations under the agreement had never been triggered, since counterplaintiffs did not personally make any payments on the Wysteria loan. (All of "their" payments had actually been made by a corporation that they owned.) *Id.* at 1032. The trial court agreed with Trossman and granted summary judgment in his favor. *Id.* at 1035-36.

¶ 77    On appeal, counterplaintiffs argued that Trossman should be equitably estopped from raising the aforementioned defense, since he was fully aware that counterplaintiffs were making corporate payments, yet he never objected or informed them that he considered their method of payment to be ineffective. *Id.* at 1039. The *Trossman* court rejected this argument. *Id.* at 1042. It observed that Trossman did not have superior knowledge of material facts; counterplaintiffs knew at least as much about their own payments as Trossman did. *Id.* The court further stated that "the means of ascertaining the legal effect of those payments were equally available to Trossman and to counterplaintiffs, in that they both could have sought legal counsel." *Id.* Accordingly, the court held that counterplaintiffs could not rely on equitable estoppel.

---

[1]Defendants argue that the applicable date for purposes of section 5-12-080(d)(2) is not the date that the receipt was placed in the mail, but four days later. In support, they cite Illinois Supreme Court Rule 12(c), which states: "Service by mail is complete four days after mailing." Ill. S. Ct. R. 12(c) (eff. Jan. 4, 2013). However, Rule 12(c) is inapplicable here, since it pertains solely to service of documents in the trial and appellate courts.

¶ 78    Likewise, in the instant case, defendants cannot claim that plaintiff had superior knowledge of material facts relating to the deductions that defendants made from her security deposit. Defendants were fully aware of the deductions they made and the documentation they attached. In addition, both parties were equally capable of ascertaining the legality of those deductions under the Ordinance. If anything, defendants would seem to be in a superior position with regard to knowledge of the relevant landlord-tenant laws, since Ms. Buol had been a landlord for 40 years. Thus, under the well-established principle that " ' "[a] party claiming the benefit of an estoppel cannot shut his eyes to obvious facts, or neglect to seek information that is easily accessible, and then charge his ignorance to others" ' " (*id.* (quoting *Town & Country Bank of Springfield*, 55 Ill. App. 3d at 95, quoting *Vail*, 192 Ill. at 570)), defendants' estoppel claim must fail.

¶ 79                                    III. CONCLUSION
¶ 80    For the foregoing reasons, we reverse the trial court's finding that the $220 deduction for repairs was not reasonable wear and tear, and we remand for the court to determine whether the damage was present at the time the tenant moved into the apartment. We also direct the trial court to make a factual determination as to whether plaintiff agreed to pay for the cost of sending her security deposit by certified mail. If the trial court answers this question in the affirmative, it is additionally to determine whether such an agreement is permissible in light of the fact that the Ordinance is silent on the subject of such agreements; and, if so, the trial court's judgment with regard to the $3.40 in postage should be reversed. We affirm the trial court's ruling in all other respects.

¶ 81    Affirmed in part and reversed in part. Cause remanded.

¶ 82    PRESIDING JUSTICE FITZGERALD SMITH, specially concurring.
¶ 83    I concur with the majority in principle. However, I question the findings of the trial court. This case is the perfect example of what is wrong with the Chicago Residential Landlord and Tenant Ordinance. It was designed with good intentions, but here, one can clearly see how a landlord can be out-maneuvered by a Machiavellian tenant and a trial judge who fails to make findings based on the evidence presented. In my view, while, again, I concur with the majority, I wholeheartedly believe this cause should be remanded to a different judge.

¶ 84    JUSTICE EPSTEIN, concurring in part and dissenting in part.
¶ 85    I respectfully disagree with the majority's conclusion that the finding of reasonable wear and tear was against the manifest weight of the evidence. That term is not well defined by the ordinance and the trial court's interpretation was within the realm of reason. See *Beelman Trucking v. Illinois Workers' Compensation Comm'n*, 233 Ill. 2d 364, 370 (2009) (a "decision is against the manifest weight of the evidence only if the record discloses that the opposite conclusion clearly is the proper result").
¶ 86    I agree that this case should be remanded for a factual determination of whether an agreement existed to send the security deposit by certified mail at the tenant's expense. I respectfully disagree with the opinion of the concurring justice that this cause should be

remanded before a different judge. I see nothing in the record to suggest that such an order is necessary or desirable.